IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 05 CR 844 |
| | ) | |
| OMAR GONZALEZ-VILLA, and | ) | |
| JESUS GONZALEZ-MENDOZA. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Omar Gonzalez-Villa's ("Gonzalez-Villa") motion to suppress evidence and Defendant Jesus Gonzalez-Mendoza's ("Gonzalez-Mendoza") motion to quash arrest and motion to suppress evidence. For the reasons stated below, we deny Gonzalez-Villa's motion to suppress evidence and deny Gonzalez-Mendoza's motion to quash arrest and motion to suppress evidence.

## BACKGROUND

On October 6, 2005, Drug Enforcement Administration ("DEA") agents instructed a cooperating source to approach Gonzalez-Villa in regards to purchasing Gonzalez-Villa's truck that he advertised for sale. During the meeting between the cooperating source and Gonzalez-Villa, the cooperating source asked Gonzalez-Villa

1

about obtaining a "sample" of narcotics. (T. 13). At this time, Gonzalez-Villa spoke to the cooperating source, who was outfitted with recording devices and an audio transmitter, about the sale of "chiva," (T. 12), which DEA agents understood to mean cocaine, for $65,000 per kilogram. At the conclusion of the meeting, the cooperating source and Gonzalez-Villa made arrangements to meet later in the day so that Gonzalez-Villa could provide the cooperating source with a sample of the narcotics.

When Gonzalez-Villa left the meeting with the cooperating source, DEA agents, including Agent Glynn, continued surveillance on Gonzalez-Villa. During their surveillance, DEA agents observed Gonzalez-Villa entering a residence at 2849 North Austin Avenue in Chicago, Illinois ("2849 North Austin Residence"). The DEA agents further observed Gonzalez-Villa leave this residence with a plastic bag containing a white substance. Upon leaving the residence, the DEA agents followed Gonzalez-Villa to his residence at 1623 South 61st Avenue in Cicero, Illinois ("Gonzalez-Villa Residence"). During a subsequent search of the 2849 North Austin Residence, DEA agents recovered narcotics in the form of a kilogram of heroin, over one kilogram of cocaine, and certain quantities of marijuana and steroids.

Later in the day on October 5, 2005, the cooperating source met with Gonzalez-Villa to obtain a sample of narcotics. After the meeting with Gonzalez-Villa, the cooperating source provided DEA agents with a sample of heroin that the cooperating source received from Gonzalez-Villa. At this point in time, the DEA agents testified at the suppression hearing that they had probable cause to arrest Gonzalez-Villa, but they did not do so in order to continue to investigate Gonzalez-

Villa so that they might obtain the identity of co-conspirators, locate other residences where narcotics were kept, and protect the cooperating source.

On October 7, 2005, at approximately 9:40 a.m., Agent Glynn and Agent Claybrook, who was sitting in the rear passenger seat of Agent Glynn's vehicle, were performing surveillance on the Gonzalez-Villa Residence when they observed Gonzalez-Villa driving with his wife and children in an automobile in an alley behind the Gonzalez-Villa Residence. At this point, Agent Glynn activated the lights on his vehicle and pulled over Gonzalez-Villa's automobile. After stopping Gonzalez-Villa's automobile, Agent Glynn, wearing a vest reading "Police," (T. 110), approached the automobile and identified himself as a law enforcement officer and instructed Gonzalez-Villa to exit the vehicle. The DEA agents did not have their guns drawn at this time.

After Gonzalez-Villa exited the vehicle, Agent Glynn performed a pat-down search. During the pat-down search, Gonzalez-Villa quickly reached into his left rear trouser pocket, at which time Agent Glynn handcuffed Gonzalez-Villa. Although Agent Glynn subsequently discovered that Gonzalez-Villa was reaching for his cellular telephone, Gonzalez-Villa was kept in handcuffs for the safety of the DEA agents. However, Gonzalez-Villa's wife and children were not placed in handcuffs. Agent Glynn subsequently attempted to speak with Gonzalez-Villa, but Gonzalez-Villa claimed to only speak Spanish and not English. At this point, Agent Glynn contacted Agent Vargas, whose native language was Spanish, so that the DEA agents could communicate with Gonzalez-Villa. While waiting for Agent Vargas to

arrive, Agent Glynn placed Gonzalez-Villa in the front passenger seat of Agent Glynn's vehicle.

Approximately twenty minutes after Agent Glynn stopped Gonzalez-Villa's vehicle, Agent Vargas arrived and began to question Gonzalez-Villa outside of Agent Glynn's vehicle. After speaking with Agent Vargas, who did not have his gun drawn, for approximately ten minutes, Gonzalez-Villa told Agent Vargas that there was a large sum of money and eight kilograms of cocaine in a pickup truck in the garage of the Gonzalez-Villa Residence. After this admission, Gonzalez-Villa then signed a written consent form allowing the DEA agents to search the Gonzalez-Villa Residence, including the garage. When the DEA agents arrived outside of the Gonzalez-Villa Residence, Gonzalez-Villa told the DEA agents to just take the money in the garage and leave. The DEA agents then discovered three kilograms of heroin, four kilograms of cocaine, and approximately $100,000 in cash located in the truck, which was located in the garage. At this point, Agent Vargas read Gonzalez-Villa *Miranda* warnings orally in Spanish. After Gonzalez-Villa was read his *Miranda* rights, he spoke about his role in narcotics trafficking and money laundering.

After the DEA agents searched the garage, they then searched the living area of the Gonzalez-Villa Residence. When the DEA agents entered the home, they discovered Gonzalez-Mendoza, who was Gonzalez-Villa's relative and shared the home with Gonzalez-Villa, seated in the kitchen. The DEA agents then identified themselves to Gonzalez-Mendoza, patted him down for weapons and escorted him

into the living room, where he was asked to sit. While in the living room Gonzalez-Mendoza was not arrested and not placed in handcuffs. Agent Vargas then spoke with Gonzalez-Mendoza and Gonzalez-Mendoza stated that he had helped to package the money and drugs that the DEA agents discovered in the pickup truck. Throughout the remainder of the day, Gonzalez-Mendoza was located either in the living room or in the garage and, at certain times, placed in handcuffs when he was moved.

At approximately 12:40 p.m., Agent Vargas gave Gonzalez-Villa a written *Miranda* form in Spanish and advised Gonzalez-Villa of his *Miranda* rights in Spanish. Gonzalez-Villa then acknowledged his understanding of his constitutional rights by signing the form. In addition, Gonzalez-Mendoza was orally read his *Miranda* warnings at approximately 1:15 p.m. in Spanish. At approximately 5:30 p.m., Gonzalez-Villa and Gonzalez-Mendoza were taken to the Berwyn, Illinois Police Department, where Gonzalez-Mendoza was presented with a written form that described his *Miranda* rights. After acknowledging that he understood his *Miranda* rights, Gonzalez-Mendoza gave a statement that was similar to the statement that he gave in his home.

Gonzalez-Villa has moved to suppress the evidence obtained during the traffic stop and subsequent search of his residence. In addition, Gonzalez-Mendoza has moved to quash his arrest and suppress the evidence obtained throughout the search of his residence. On May 8, 2007, we held an evidentiary hearing relating to these motions.

**DISCUSSION**

I.  Gonzalez-Villa

Gonzalez-Villa moves to suppress the evidence obtained during the traffic stop and subsequent search of his residence.

A.  Traffic Stop

Gonzalez-Villa contends that he was seized in violation of his Fourth Amendment rights.  In accordance with *Terry v. Ohio*, 392 U.S. 1 (1968), a law enforcement officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop if the officer has a reasonable suspicion supported by articulable facts that 'criminal activity may be afoot.'"  *United States v. Hendricks*, 319 F.3d 993, 1001 (7th Cir. 2003)(quoting *Terry*, 392 U.S. at 30).  In order to determine whether an officer's suspicion was reasonable, the court must "evaluate the totality of the circumstances as they appear to the officer at the time of the stop."  *Id.*; *see U.S. v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005)(noting that the circumstances must be viewed "in their entirety," and that a court cannot "simply evaluate and reject each factor in insolation from the other factors").  Reasonable suspicion must be objectively manifested.  *Id.* at 675 (explaining that a "detaining officer [must have] a 'particularized and objective basis' for suspecting illegal activity")(quoting in part *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002)).

In the instant action, the detaining officer, Agent Glynn, was a narcotics agent with over eleven years of experience.  *See Zambrana*, 428 F.3d at 675 (noting that

the "totality of the circumstances" test includes the "experience of the law enforcement agent and the behavior and characteristics of the subject"). *Id.* Before making the *Terry* stop on October 7, 2005, Agent Glynn knew that on October 6, 2005, Gonzalez-Villa had discussed the price of providing a quantity of heroin with the cooperating source and that Gonzalez-Villa had provided a sample of heroin available for purchase to the cooperating source. Further, Agent Glynn had knowledge that a large quantity of narcotics had been found in a house that Gonzalez-Villa was seen entering and exiting on the previous day. The DEA agents sought to conduct an investigatory inquiry before Gonzalez-Villa could gain control of, remove, or destroy any drugs which might be on his property. *See U.S. v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006)(stating that "even if the defendant did not actually commit an offense" a traffic stop can be reasonable "as long as the officer reasonably believed an offense occurred"). When these circumstances are viewed together in their entirety, it is reasonable that Agent Glynn had a particularized and objective basis for suspecting Gonzalez-Villa was engaged in illegal activity at the current time. *See generally U.S. v. Jimenez*, 602 F.2d 129, 142 (7th Cir. 1979)(stating that a *Terry* stop can be reasonable regardless of whether reasonable suspicion is based upon observations of the defendant engaging in suspicious conduct over a short or long period of time). Therefore, the detaining DEA agents had the requisite reasonable suspicion to legally seize Gonzalez-Villa for the purpose of confirming or dispelling the DEA agents' suspicions.

B. Custodial Interrogation

Gonzalez-Villa argues that he was not extended the procedural safeguards of *Miranda v. Arizona*, 384 U.S. 436 (1966), in a timely fashion and, as a result, DEA agents obtained statements from him in violation of his Fifth Amendment rights. A defendant who is subjected to custodial interrogation must first be advised of his rights under *Miranda*. *Dickerson v. U.S.*, 530 U.S. 428, 435 (2000). A defendant must be "in custody" and "subject to interrogation" to trigger the protections of *Miranda*. *See United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994)(stating that a person is "in custody for the purposes of *Miranda* if that person is either formally arrested or has suffered a 'restraint on freedom of movement' of the degree associated with formal arrest")(quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). To determine whether a defendant is "in custody," the court must determine "how a reasonable man in the [defendant's] position would have understood his situation" by examining a totality of the circumstances. *Burns*, 37 F.3d at 280 (quoting in part *Berkemer*, 468 U.S. at 442). Relevant to this determination is the defendant's "freedom to leave the scene and the purpose, place and length of interrogation." *U.S. v. Hocking*, 860 F.2d 769, 773 (7th Cir. 1988). The Government asserts that Gonzalez-Villa's statements were not made in violation of his Fifth Amendment rights as *Miranda* warnings were not required during this *Terry* stop.

Gonzalez-Villa contends that Agent Vargas obtained information from Gonzalez-Villa in violation of *Miranda*. The Seventh Circuit has held that "*Miranda*

8

warnings are not required where a suspect has been detained pursuant to a *Terry* investigatory stop." *Burns*, 37 F.3d at 281 (noting that *Terry* stops are analogous to ordinary traffic stops, and are thus similarly non-coercive, and explaining that finding "that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*"). The Seventh Circuit has found that a *Terry* stop is not converted into a full custodial arrest when law enforcement officials draw their weapons or use handcuffs, provided such use is reasonably necessary to assure the officers' or bystanders' safety. *U.S. v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007); *see U.S. v. Tilmon*, 19 F.3d 1221, 1226-28 (7th Cir. 1994)(holding that the determining factor in whether a use of force during a *Terry* stop is reasonable is whether "the surrounding circumstances give rise to a justifiable fear for personal safety").

In the instant action, the DEA agents possessed reasonable articulable suspicion as to Gonzalez-Villa's involvement with narcotics, which entitled them to temporarily detain Gonzalez-Villa for an investigatory inquiry. Once stopped, Gonzalez-Villa was asked to step out of his vehicle and a protective pat-down was performed for the safety of the officers. During the course of this pat-down, Gonzalez-Villa made a quick movement to grab his left rear pants pocket. Agent Glynn quickly handcuffed Gonzalez-Villa as a protective measure, as he was unaware of Gonzalez-Villa's intentions. During this time, neither officer at the scene had a weapon drawn. Once Gonzalez-Villa indicated that he did not speak English, a Spanish-speaking DEA agent was called to the scene to speak to Gonzalez-Villa. Agent Vargas arrived approximately fifteen minutes later. In examining the totality

9

of the circumstances, it is apparent that Gonzalez-Villa was not in custody. He was not told that he was under arrest, and none of the officers had their weapons drawn. The officers' use of a protective pat-down and handcuffs were reasonably necessary to assure both the officers' and Gonzalez-Villa's safety, and did not amount to a custodial arrest. Once Agent Vargas arrived, he immediately questioned Gonzalez-Villa in a language that Gonzalez-Villa understood, a few car-lengths away from his vehicle. Neither of the two officers in Gonzalez-Villa's immediate vicinity had their weapons drawn. At the time, Gonzalez-Villa was thirty-six years of age, and a former Mexican police officer. In examining the totality of the circumstances, a reasonable thirty-six year old former Mexican police officer would have understood his situation to not have equated to being in custody before or during Agent Vargas's questioning. Therefore, the statements Gonzalez-Villa made to Agent Vargas were not given in violation of his Fifth Amendment rights.

    C. Consent to Search

Gonzalez-Villa argues that he did not voluntarily consent for the police to search his home. In general, warrantless searches are unreasonable under the Fourth Amendments, with certain "specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357 (1967), such as a search pursuant to the consent of a defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Such consent to search by a defendant to the police must be voluntary. *Id*. at 222. To be voluntary, the consent to search by a defendant must "not [be] the product of duress

or coercion, express or implied," which must be determined by looking at the "totality of all the circumstances." *Id*. at 227. The Seventh Circuit has articulated the following factors to be considered in determining whether such consent was voluntary: "(1) the age, intelligence, and education of the person who gave consent, (2) whether she was advised of her constitutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in police custody at the time she gave her consent." *United States v. Cellitti*, 387 F.3d 618, 622 (7th Cir. 2004). The Government bears the burden of proving by a preponderance of the evidence that the consent was voluntary. *United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir. 1995). The Government contends that Gonzalez-Villa's consent was voluntary.

Gonzalez-Villa argues that his statements should be suppressed as involuntary. As noted above, although Gonzalez-Villa was handcuffed, he was not in such an inherently coercive environment as to be considered in custody. *See United States v. Watson*, 423 U.S. 411, 424 (1976)(stating that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search"). Gonzalez-Villa is also a thirty-six year old, former police officer in his home country of Mexico, and he did not express any reservations or confusion concerning his constitutional rights when he signed the form consenting to the search of his residence. In addition, once Agent Glynn became aware that Gonzalez-Villa did not speak English, Agent Glynn stopped speaking with Gonzalez-Villa and immediately

contacted Agent Vargas, whose native tongue is Spanish.  Further, Gonzalez-Villa was placed in the front passenger seat of Agent Glynn's vehicle, rather than in the rear lockup, while Agent Glynn awaited the arrival of Agent Vargas.  As soon as Agent Vargas arrived at the place of the investigatory stop, Gonzalez-Villa exited the automobile and Agent Vargas immediately began speaking with Gonzalez-Villa in Spanish.  This conversation between Agent Vargas and Gonzalez-Villa took place in close range to Gonzalez-Villa's automobile, with only Agent Vargas and Agent Malloy in the immediate vicinity, and without any weapons drawn by the DEA agents.  Further, Gonzalez-Villa gave the police consent to search his residence approximately twenty minutes after the investigatory stop took place, and only minutes into the conversation between Agent Vargas and Gonzalez-Villa.  In addition, the consent form that Gonzalez-Villa signed was written in Spanish, and stated that Gonzalez-Villa gave his consent to search his residence "freely" and that he had "not been threatened nor forced in any way" to give his consent.  (T. 28-29). Finally, the evidence before the court overwhelmingly shows that "the [DEA agents] did not badger [Gonzalez-Villa] for information or consent, nor physically abuse or pressure him."  *United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000). Therefore, based on the totality of the circumstances, Gonzalez-Villa voluntarily consented to the search of his home and garage.

### D.  Voluntariness of Statements

Gonzalez-Villa contends that his statements to DEA agents following the

search of the Gonzalez-Villa Residence were made involuntarily, in violation of his Fifth Amendment rights. The Seventh Circuit has articulated that "a 'confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Abdulla*, 294 F.3d 830, 836 (7th Cir. 2002)(quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). In addition, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Id*. In determining the totality of the circumstances, the court must "examine the surrounding circumstances and the entire course of police conduct." *Oregon v. Elstad*, 470 U.S. 298, 318 (U.S. 1985).

As stated above, Gonzalez-Villa was not in a custodial situation that required *Miranda* warnings to be issued. In addition, Gonzalez-Villa was a thirty-six year old former police officer, who was spoken to by Agent Vargas in Gonzalez-Villa's native language. Further, Gonzalez-Villa was afforded the opportunity to sit in the front seat of Agent Glynn's vehicle for less than twenty minutes, rather being detained in the back seat. Also, Gonzalez-Villa was only questioned by Agent Vargas for a short period of time, and not questioned by any other agents. In questioning Gonzalez-Villa, Agent Vargas did not have his gun drawn, Agent Vargas did not use any physical force towards Gonzalez-Villa, and Gonzalez-Villa was located in a familiar environment in front of his home, in the morning, with his family nearby. Finally, even if Gonzalez-Villa's initial statement to Agent Vargas

was in violation of *Miranda*, there is no indication that such statements were coerced or that any subsequent confessions by Gonzalez-Villa were other than voluntary. Based on the foregoing analysis, we deny Gonzalez-Villa's motion to suppress.

II. Gonzalez-Mendoza

Gonzalez-Mendoza moves to quash his arrest and suppress the evidence obtained throughout the search of his residence.

A. Detention in Residence

Gonzalez-Mendoza argues that the DEA agents did not have probable cause to seize Gonzalez-Mendoza in the Gonzalez-Villa Residence and that any statements by Gonzalez-Mendoza are in violation of the Fourth Amendment. The Fourth Amendment protects citizens against "unreasonable searches and seizures." U.S. Const. Amend. IV. As noted above, warrantless searches and seizures are unreasonable under the Fourth and Fourteenth Amendments, with certain "specifically established and well delineated exceptions." *Katz*, 389 U.S. at 357. One exception is a search pursuant to the consent of a defendant. *Schneckloth*, 412 U.S. at 219.

Gonzalez-Mendoza contends that the DEA agents did not have a reason to suspect him of any involvement in criminal activity. As the Supreme Court noted in

*Mich. v. Summers*, 452 U.S. 692 (U.S. 1981), a valid search of a residence and subsequent detention is akin to a *Terry* stop. *Id*. at 700. Due to the familiarity of the inhabitant, such a detention in a defendant's residence can "'only add minimally to the public stigma associated with the search itself and . . . involve[s] neither the inconvenience nor the indignity associated with a compelled visit to 'the police station'" and, thus, detention in one's own residence is "'substantially less intrusive' than an arrest." *Burns*, 37 F.3d at 280 (quoting *Summers*, 452 U.S. at 702). In the instant action, the search of the Gonzalez-Villa Residence was proper since Gonzalez-Villa gave the DEA agents consent to search the home and garage. In addition, prior to the DEA agents' search of the living residence adjacent to the garage, the DEA agents knew that Gonzalez-Villa had given a sample of heroin to the cooperating source, that a bag in a pickup truck in the garage contained approximately $100,000, and that a bag in the pickup truck in the garaged contained large amounts of narcotics. Further, the DEA agents testified that based on their years of experience as DEA agents, narcotics traffickers often used firearms to protect their narcotics and money. Also, Gonzalez-Mendoza was located in the residence of Gonzalez-Villa, who had admitted selling narcotics and being associated with other known drug dealers. Finally, when the DEA agents questioned Gonzalez-Mendoza, he was neither handcuffed not threatened. When these circumstances are viewed together in their entirety, it is reasonable that the DEA agents had a particularized and objective basis for suspecting Gonzalez-Mendoza was engaged in illegal activity at the current time. Therefore, based on the totality of the

circumstances, it was reasonable for the DEA agents to pat-down Gonzalez-Mendoza to check for weapons and to subsequently question Gonzalez-Mendoza about his knowledge of the narcotics and money discovered in the garage.

B. *Miranda*

Gonzalez-Mendoza also argues that he was questioned by DEA agents in violation of *Miranda*. As we previously stated, a defendant who is subjected to custodial interrogation must first be advised of his rights under *Miranda*. *Dickerson*, 530 U.S. at 435. A defendant must be "in custody" and "subject to interrogation" to trigger the *Miranda* warnings. *See Burns*, 37 F.3d at 280 (stating that a person is "in custody for the purposes of *Miranda* if that person is either formally arrested or has suffered a 'restraint on freedom of movement' of the degree associated with formal arrest")(quoting *Beheler*, 463 U.S. at 1125). To determine whether a defendant is "in custody," the court must determine "how a reasonable man in the [defendant's] position would have understood his situation" by examining a totality of the circumstances. *Burns*, 37 F.3d at 280 (quoting in part *Berkemer*, 468 U.S. at 442). Relevant to this determination is the defendant's "freedom to leave the scene and the purpose, place and length of interrogation." *Hocking*, 860 F.2d at 773.

As noted above, the DEA agents' search of the Gonzalez-Villa Residence was proper due to Gonzalez-Villa's valid consent to search the home and the garage that he shared with Gonzalez-Mendoza. In addition, Gonzalez-Mendoza was patted down and questioned in the kitchen and living room of his residence. Finally,

Gonzalez-Mendoza was notified of his *Miranda* rights at approximately 1:15 p.m., and he subsequently waived those rights. Therefore, Gonzalez-Mendoza was not in the type of custody that triggered the protections of *Miranda* since his detention was "'substantially less intrusive' than an arrest." *Burns*, 37 F.3d at 280 (quoting *Summers*, 452 U.S. at 702).

     C. Voluntariness of Statements

Gonzalez-Mendoza argues that his statements to the DEA agents were in violation of the Fifth Amendment. A defendant's statement to law enforcement officials is not compelled if the defendant "voluntarily, knowingly, and intelligently" waives his constitutional rights. *Miranda*, 384 U.S. at 444. The Seventh Circuit has articulated that "a 'confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Abdulla*, 294 F.3d at 836 (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). In addition, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Id*. For a waiver of *Miranda* rights to be knowing and intelligent, such a waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). As the Supreme Court has noted, "the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is [not]

17

a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case." *Elstad*, 470 U.S. at 317.

In the instant action, Gonzalez-Mendoza was notified twice of his *Miranda* rights at approximately 1:15 p.m and 5:35 p.m., and Gonzalez-Mendoza waived those rights. The evidence presented at the suppression hearing establishes that the DEA agents informed Gonzalez-Mendoza of his *Miranda* rights in a non-threatening, non-deceptive, and non-coercive manner. For example, during questioning of Gonzalez-Mendoza, he was not handcuffed and the DEA agents did not have their guns drawn. In addition, Gonzalez-Mendoza was initially searched in his kitchen and questioned in his own living room. Further, the DEA Agents informed Gonzalez-Mendoza of his *Miranda* rights both orally and in writing, and Gonzalez-Mendoza did not express confusion and did not ask questions about the *Miranda* warnings provided to him. Thus, Gonzalez-Mendoza knowingly, intelligently, and voluntarily waived his constitutional rights. Based on the analysis above, we deny Gonzalez-Mendoza's motion to quash his arrest and deny Gonzalez-Mendoza's motion to suppress.

## CONCLUSION

Based on the foregoing reasons, we deny Gonzalez-Villa's motion to suppress evidence and deny Gonzalez-Mendoza's motion to quash arrest and motion to suppress evidence.

_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated: May 31, 2007